CHICAGO, R. I. & P. RY. CO. et al. v. INTERSTATE COMMERCE
COMMISSION et al.

CHICAGO, B. & Q. R. CO. et al. v. INTERSTATE COMMERCE
COMMISSION.

(Circuit Court, N. D. Illinois, E. D.    August 24, 1909.)

Nos. 29,247, 29,472.

1. COMMERCE (§ 85*)—INTERSTATE COMMERCE COMMISSION—POWERS.
    The Interstate Commerce Act (Act Feb. 4, 1887, c. 104, § 15, 24 Stat.
384 [U. S. Comp. St. 1901, p. 3165]), as amended by Hepburn Act June
29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1907, p. 900),
does not confer power on the Interstate Commerce Commission to lower
through rates between certain points, as between Atlantic seaboard
points and Missouri river points, and between Mississippi river points
and Denver, without changing the rates to intermediate points, or finding
that existing rates are unjust or unreasonable, or otherwise in violation
of the act; the sole purpose and effect being to arbitrarily create zones
of trade, tributary to given trade and manufacturing centers, and counter-
act the commercial advantages possessed by certain cities by reason of
their geographical position or otherwise, by giving Atlantic coast and
Missouri river cities an artificial advantage over intermediate points in
shipments to the Missouri river and westward to points east of Denver,
and the east Mississippi cities, and Denver an advantage over Missouri
river cities to points west of Denver.
    [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]
2. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDERS
    BY THE COURTS.
    · Orders made by the Interstate Commerce Commission, which are be-
yond the power conferred on it by the statute, are subject to review by
the courts, which may enjoin their enforcement.
    [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 98.*]
    Baker, Circuit Judge, dissenting.

In Chancery.   On motion in one case for permanent injunction, and
in the second case for a preliminary injunction.

In No. 29,247:

W. D. McHugh and Colin C. H. Fyffe, for complainants and inter-
vening co-complainants.

· Edwin W. Sims, U. S. Atty., and Luther M. Walter, Sp. Asst. U.
S. Atty., for defendant.

John H. Atwood and John L. Webster, for intervening codefendants.

In No. 29,472:

W. D. McHugh and S. A. Lynde, for complainants.

Edwin W. Sims, U. S. Atty., and Luther M. Walter, Sp. Asst. U.
S. Atty., for defendant.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

GROSSCUP, Circuit Judge.   The bill in No. 29,247 is to restrain
the Interstate Commerce Commission from putting into force an or-
der entered June 24th, 1908, relating to rates from the Atlantic sea-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

board to the Missouri River. Since the filing of the bill, six railroads, other than the complainants, have intervened; as also nine individuals and corporations, representatives of the trade and manufacturing interests of St. Louis, Chicago, Milwaukee, Detroit and Cleveland. To defend the order, certain commercial and manufacturing firms in Missouri River cities have also intervened. Indeed, the contest, in its larger aspect, is a contest, not so much between the shippers and the railroads, as between the commercial and manufacturing interests of the Missouri River cities and of the Atlantic seaboard on the one part (their interests being identical) and the commercial and manufacturing interests of what is known as the Central Traffic territory (the territory west of Buffalo, Pittsburg and Parkersburg, and east of the Mississippi River) on the other part.

The bill in No. 29,472 is a bill to restrain the Interstate Commerce Commission from putting into force an order entered on the 2d day of March, 1909, on complaint of George Kindel, a manufacturer of Denver, Colorado, relating to joint rates from Chicago and St. Louis to Denver; the question raised, in its larger aspect, being again a question, not so much between the shippers and the railroads, as between the commercial and manufacturing interests of Denver and of the territory east of the Mississippi River on the one side, and the commercial and manufacturing interests of the Missouri River cities on the other.

Case No. 29,247 is on final hearing, while case No. 29,472 is upon a motion for a temporary injunction upon the bill and a demurrer thereto. In the latter case certain affidavits were filed which, in view of the conclusion to which we have come, it is unnecessary to consider.

The rate now in force from the Atlantic seaboard to the Missouri River, on first class matter, is $1.47 per hundred pounds. The proposed reduction by the Commission is to $1.38 per hundred pounds. The through rate now in force on the same matter from the Atlantic seaboard to the Mississippi River is 87 cents per hundred pounds, which, plus the through rate from the Mississippi River to the Missouri River (60 cents per hundred pounds) makes the same total, $1.47 per hundred pounds, as the rate from the Atlantic seaboard to the Missouri River. It is not proposed by the Commission that these through rates, or either of them, should be reduced. On the contrary, the Commission proposes to retain them, to the end that the manufacturers and jobbers on the Atlantic seaboard may deliver their goods to the Missouri River cities on a joint rate nine cents less per hundred pounds on first class matter (and a corresponding differential upon second, third and fourth class matter) than would be done if the goods, or (in the case of manufacturing) the raw material going into the goods, were first sent to the cities in the Mississippi River territory, and then re-sent from those cities to the Missouri River cities.

The joint rate now in force from Chicago to Denver, on first class matter, per hundred pounds, is $2.05, and from St. Louis to Denver, $1.80. The proposed reduction by the Commission is to $1.80 in the Chicago rate, and $1.62 in the St. Louis rate—the through rates, however, from Chicago and St. Louis to the Missouri River cities, and

from the Missouri River cities to Denver, to remain unchanged—the effect of which will be that the manufacturers and jobbers to the eastward of the Mississippi River may deliver their goods to Denver at a joint rate of 23 cents less per hundred pounds, on first class matter— and a corresponding differential on second, third and fourth class matter—by way of St. Louis, and approximately the same by way of Chicago, than would be done if the goods, or, in the case of manufacturing, the raw material, were first sent to the cities along the Missouri River and then re-sent from those cities to Denver; from which it is apparent that, whatever may be the principle on which these orders are based, the effect will be, by means of the differentials named, to protect to a certain degree the Missouri River jobbers and manufacturers within a given zone of territory against the jobbers and manufacturers in the Central Traffic Association territory, and to protect, to a certain degree, the Denver jobbers and manufacturers, within a given zone of territory, against the competition of the Missouri River jobbers and manufacturers, as also to open up to the Atlantic seaboard, in its trade with both the Missouri River and the Denver zones of territory, the advantages contained in the differentials, against the competition of both the intervening Central Traffic Association territory and the Missouri River territory. That such a power, exercised upon any principle outside of cost of carriage, or the conditions created by competitive carrying lines, or any other natural conditions, and exercised with substantial effect—power artificially to apportion out the country into zones tributary to given trade centers to be predetermined by the Commission, and non-tributary to others—would be a power essentially different in principle from the mere power of naming rates that are reasonable, is, we think, too clear on its face to render discussion necessary.

There is no testimony that the cost of carriage from the Atlantic seaboard to the Missouri River, or the cost of carriage from Chicago and St. Louis to Denver is less on through traffic than on traffic that goes first to the Mississippi River and then is re-shipped to Missouri River cities, or that goes first to Missouri River cities and then is re-shipped to Denver. On the contrary, it was stated at the argument and not controverted, in the case of shipments from the Atlantic seaboard to the Missouri River cities, that the cost of service is not greater on re-shipments than on through shipments. Cost of service, therefore, is neither the principle upon which the Commission's orders are founded nor the purpose for such orders.

There are no natural competitive carrying lines, such as the water lines that affect rates to Minneapolis and St. Paul, or to the Gulf cities, or to the Pacific Coast, that call for or suggest a less joint rate in either of these cases than the sum of the two through rates. Indeed, no suggestion, based upon competitive lines of carriers, or upon increased cost of service, or upon any other consideration than the one hereafter named, is offered as a reason for the orders of the Commission involved.

What then is the principle upon which the orders of the Commission are based; what their purpose; and what will be their effect? Upon

the answer to these questions the power of the Commission to make the orders turns.

The trade centers of the country, as they exist to-day, have grown up as the result of conditions, some of them natural, and some of them more or less artificial. For many years the Mississippi River was the country's frontier. To reach it, the eastern roads were built and consolidated, and at the Mississippi River they stopped. In time the frontier was pushed to the Missouri River. To reach that country, the western roads were built; from the Mississippi River they started; and at the Missouri River all the earlier ones stopped. The Mississippi River thus became a dividing line between the eastern and the western system of carriers, and on that account, perhaps more than for any other reason, became what is known as a base line for the fixing of through rates; that is to say, through rates from the Atlantic seaboard were made to the Mississippi River somewhat less than the sum of the intermediate local rates, and through rates were made from the Mississippi River westward somewhat less than the sum of the intermediate local rates; no rate, however, through or joint, before the orders here involved, having been made that ignored the Mississippi River as the base line. Subsequently, the Missouri River became a dividing line between the railroads east of it and the railroads west of it—becoming at the same time a base line for the fixing of through rates; that is to say, through rates were made to the Missouri River, from the eastward, somewhat less than the sum of the intermediate local rates between the rivers; and through rates were made from the Missouri River westward somewhat less than the sum of the intermediate local rates; none of the rates, however, ignoring the Missouri River as the base line.

That the purpose of the Commission, in the orders involved, is to annul these conditions upon which the trade centers of the country have grown up, interposing a rate-making principle entirely different, is not controverted. That principle, as stated by the Commission itself, in its most general terms, is that the rates "through" the basing lines—that is, from any point east of such basing line to any point west of such basing line—shall always be less than the sum of the rates from the initial point to the basing line and from the basing line on to the point of delivery. As thus stated, the principle, abstractly, may not be wrong. We are not prepared to say that the Commission has not power to enter upon a plan looking toward a system of rates wherein the rates, for longer and shorter hauls, will taper downward according to distance, provided such tapering is both comprehensively and symetrically applied—applied with the design of carrying out what may be the economic fact that, on the whole, it is worth something less per mile to carry freight long distances than short distances.

But it does not follow that power of that character includes power, by the use of differentials, to artificially divide up the country into trade zones tributary to given trade and manufacturing centers, the Commission, in such case having, as a result, power to predetermine what the trade and manufacturing centers shall be; for such a power, vaster than any that any one body of men has heretofore exercised,

though wisely exerted in specific instances, would be putting in the hands of the Commission the general power of life and death over every trade and manufacturing center in the United States.

Now, is it this power—the one last stated—that the Commission, in the orders before us, is actually exerting? And will the effect of these orders be to put such power, on the part of the Commission, into substantial effect? These are the questions on which these cases turn.

That the Commission, in the orders under consideration, is entering upon the exercise of such power, and intentionally doing it, is, we think, clearly shown:

(a) By the express avowal of the Commission, in the body of its opinion in case No. 29,247 (giving the reasons why the inter-river rates are not reduced). The occasion that gave rise to the order in favor of the Missouri River cities was the complaint that St. Paul and Minneapolis could invade territory naturally tributary to the Missouri River cities, because of the lower joint rate from the seaboard to the Twin Cities than from the seaboard to the Missouri River cities.; and one of the purposes of the Commission in reducing the rate between the Mississippi and the Missouri Rivers, as part of the seaboard-Missouri River joint rate, undoubtedly was to ameliorate that disadvantage. But that an additional purpose was to protect the Missouri River cities against the competition of the trade and manufacturing of the Central Traffic Association territory, and to give to the Atlantic seaboard advantages in rates over Central Traffic territory, is clearly set out in the opinion, as follows:

"That if the local rates between the Mississippi and Missouri Rivers were reduced, it would give the same degree of advantage to all the producing and distributing centers on and east of the Missouri River, and their relative advantages and disadvantages would not be changed;"

And also by this further paragraph in the opinion:

"It seems patent that any change in the rates east of the Mississippi River, even if warranted, would fail to accomplish what the complainants desire, because whatever of advantage accrued therefrom to Missouri River cities, would accrue to a like degree or extent to their principal competitive commercial centers;"

(b) By the fact that there was no inquiry by the Commission respecting the "reasonableness" or "unreasonableness" of the rates between the Mississippi River and the Missouri River, or between the Missouri River and Denver, other than on the zone theory of apportioning trade—no attempt to arrive at a rate that would be reasonable, other than on the postulate that there must be a differential against the Central Traffic territory in favor of the Missouri River cities, and against the Missouri River cities in favor of Denver; and by the fact,

(c) That the Commission, under circumstances inviting explanation, does not disavow its claim of power, or the effect of these orders. The excerpt quoted from the Commission's opinion in the Missouri Rive: rate hearing, was used as the ground upon which the preliminary order in No. 29,247 was chiefly based. Since that time, the Commission has spoken in the Denver rate hearing and also in its annual report. In neither has there been a disavowal of the power said to be claimed or the effect said to be produced; and

(d) By the differentials themselves—differentials in both cases that bear no indication whatever that they are parts of a comprehensive and symmetrical tapering system based on the possible economic fact that, on the whole, it is worth less per mile to haul long distances than short distances; but, on the contrary, differentials that are applied at given lines abruptly and decidedly—just so adjusted as to protect the one zone against the competition of the other. Indeed, it is our judgment that the Commission believes itself possessed of this power—claims such power as belonging to it under the law, and as beneficial to the trade and commerce of the country—and that if the question were put plainly to that able body of men, there would be no effort to conceal their ultimate purpose under any pretext that, in the orders under review, they were dealing merely with the "reasonableness" or "unreasonableness" of the specific rates involved.

Such being, in our judgment, the principle on which the orders were actually based, and the purpose of the Commission, the question remains, what is their substantial effect? Much testimony on that question has been introduced. A manufacturer of fiber cans in Detroit, testifies that his principal competitors are on the Atlantic seaboard; that from the east he gets his raw material, paying regular railroad rates; that considering the rates as they now are, the eastern man gets to the Missouri River country on an even basis with him; but that if the differential in the order is applied, it will give to the seaboard, as the place for the manufacturing of cans, an advantage in trade with the Missouri River cities that will put the Detroit manufacturer, so far as that field is concerned, out of business. "Business is done on such a close margin that that would control the business. He [the eastern competitor] would get it and I would lose it." In other words, in such manufactures, where the Central Traffic Association territory must bring its raw material, or a substantial part of it, from the east, with no differential in their favor, the differential that the Commission applies, in the orders before us, would make it commercially disadvantageous to have the manufactory located in Central Traffic Association territory. Or, as Mr. Hill tells us, respecting the application of zone rates in Australia, the centers of manufacturing and trade would build up at the ends of the lines only.

The Sherwin-Williams Company, manufacturers of varnish, paint, etc., at Cleveland, say:

"Raw material brought into the seaboard and shipped west to Chicago and the Mississippi River is on the basis of fourth class rate. The same is true with regard to the manufactured product. Were the manufacturers on the seaboard allowed the differential of four cents between the rivers, I can see no other way but what it would actually close the varnish factories west of Buffalo if such a combination were strong enough or cared to control the entire output."

And again:

"Assuming our profits were 20 cents a hundred pounds and the new adjustment occasioned a diminution of profits to 16 cents, I think our establishment would be wiped out of business. There is no question but that the eastern manufacturers would fill the territory with their salesmen and get the business until you could not do business at a profit."

Whitelaw Brothers, of St. Louis, jobbers and commission merchants in heavy chemicals, say: That should an attempt be made to add to the advantage that Missouri River cities already get in the way of carload commodity rates—two, three, five, seven or nine cents a hundred more—the result would be that they could not do business in the Missouri River country; "that two cents a hundred in the lot of merchandise that we handle is our profit, and we don't always get it."

Other witnesses testify to the same effect; many of them admitting, however, that the differential would not wipe out their profits; but all of these insisting that the very fact that their seaboard competitors could say to the merchants in the Missouri River country that the seaboard had an advantage of nine cents in freight over the intervening Central Traffic Association territory would create such an impression upon the minds of the Missouri River dealers as to put the manufacturers in the intervening territory at a great disadvantage.

It was said at argument that in none of these cases was the entire profit wiped out—that in many cases, on the contrary, in Central Traffic territory, owing to natural advantages, the profits even then would remain larger to the Central Traffic territory manufacturer than to his seaboard competitor. But that is not the point of the inquiry. The inquiry is not, are the trade and manufacturing of the intervening zone put out of competition; but are they, by this artificial differential, put at a disadvantage in competition that they otherwise would not suffer; for unless the Commission has power over the trade and manufacturing of the country, every commercial house and manufacturer is entitled to all the advantages that their natural situation gives them. And why, unless the effect is a substantial one, was it sought by the initiating commercial and manufacturing interests of the Missouri River cities, and why is it asked for by the manufacturing interests of the seaboard? Is it not enough, upon the question presented to us, that the change is wanted by those, who know better than we do, its value to them, and is resisted by those, who know better than we do, its disadvantages to them? Indeed, but for the consciousness of the Commission that by such differentials natural advantages in the way of competition could be overcome, these orders would never have been entered, for their very purpose was to countervail the differentials that the Twin Cities, by reason of their natural situation, had been obtaining—differentials only a little larger than the ones here involved.

That being the case, the question recurs, what power on this subject did Congress intend to confer upon the Commission? The manufacturers of the Atlantic seaboard say that inasmuch as their competitors in the Central Traffic Association territory are in closer proximity, both to the consumers of the West and to the raw material originating in the West, as in the case, for instance, of the shoe and leather industry, it is only fair that a rate differential may be interposed that, to some extent, will counterbalance such disadvantages. Did Congress intend, in the Interstate Commerce Act, that this counterbalancing power should be given to the Interstate Commerce Commission? The merchants and jobbers of the Missouri River cities claim that as against the merchants and jobbers of St. Louis, Chicago and Milwau-

kee, the jobbing centers next contiguous to them (and it appears that the jobbing trade is largely dependent upon contiguity), they are fairly entitled to the trade of the Missouri River territory; and likewise, the merchants and jobbers of Denver, as against the merchants and jobbers of the Missouri River cities next contiguous to them, claim that they are fairly entitled to the trade of the territory tributary to Denver. Did Congress intend to confer upon the Commission, through its supervision over rates, power to determine the fairness of such claims, and to carry out such determination? The protective tariff policy of the nation, as a nation, against the competition of alien nations, has been carried out by Congress in the imposition of rates or burdens upon imported articles. Did Congress intend, in the Interstate Commerce Act, to extend that principle so as to have it protect given zones into which the country, intraterritorially, might be divided, against the natural advantages of contiguous zones, to be effectuated by the fixing of carrier rates as the general protective principle is effectuated by the fixing of customs rates by Congress? If so, the first and necessary step would have been to have conferred upon the Commission power, full and express, to fix rates.

But when we come to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), we find that Congress has left the fixing of rates initially, not with the Commission, but with the railroads. The sole power conferred upon the Commission is, in any given case of a rate being found unreasonable in the amount charged, or unduly discriminatory between individuals or localities, to command the carrier to desist, and, as a corrective, to name a rate in the place of such given rate that will not be unreasonable or unduly discriminatory. These provisions, as we read them, were designed, so far as localities are a factor in the question, to prevent localities from being built up or destroyed by artificial rates, not to continue the policy that, by artificial rates, builds up and destroys localities—to take away from the railroads the power of life and death over the manufacturers and commerce of given localities, not to transfer such power to the Commission or any other single body of men. Possibly there remains to the railroads, as the law now stands, power to lower the rates "to what the traffic will bear"—temper the rates to peculiar conditions—in the case of some new promise of commerce struggling to get upon its feet; moved thereto, as a matter of course, by their judgment that what may appear to be largely a matter of benevolence now will turn out to be a sagacious and profitable planting of seed. But surely Congress did not intend to invest the Commission with power to compel the railroads to make such ventures. Nor could the railroads themselves enter upon them as parts of a scheme to rearrange trade zones and trade centers. Indeed, it was largely upon the complaint that such power was the exercise of arbitrary power, and was being usurped by the railroads, that led Congress, in the first instance, to enact the Interstate Commerce Act; and until Congress speaks with more certainty than it has already spoken, we do not feel at liberty to read into the act an intention that the manufacturers and commerce of any given locality have, by the enactment of the Inter-

state Commerce Law, simply been changed from the keeping of the railroads to that of the Commission.

The right of the courts to review these orders is challenged, and Union Bridge Company v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, is urged upon us as a ruling of the Supreme Court of the United States that the finding of the executive power of the Government, when such finding is constitutionally committed to the executive power by law, shall not be reviewed by the courts. With that case, we have no dispute. In that case the act clearly put it within the power of the Secretary of War to determine whether the bridge involved was an unreasonable obstruction of the Allegheny River; and the bestowal of that power on the Secretary of War was held to be constitutional. The whole question, therefore, in that case, was a question of fact, constitutionally committed by the law to the executive department of the Government.

But in the case here, the question involved is not a question of fact, but a question of power—the question is not whether, by the application of correct principles, a given rate has been decided by the Commission to be unreasonable, but whether the principles applied are themselves within the power of the Commission; for Congress did not intend to confer upon the Commission power to do by indirection what it could not directly do—did not intend to include within the word "reasonable" every power over the trade and manufacturing of the country that the Commission should determine it was reasonable that it (the Commission) should possess.

Again, it is urged that though the effect of the order in the Missouri River case is to discriminate in favor of the Atlantic seaboard and the Missouri River cities against the Central Traffic territory, and in the Denver case in favor of Denver and the east Mississippi River country against the Missouri River cities, the discrimination is not "undue" within the meaning of the Interstate Commerce Act; and that therefore the Courts have no power to enjoin. The difficulty with this argument is that it draws no distinction between the power that the Commission is actually given—a power that carries with it, as a necessary incident, the right to make discriminations if they be not "undue"—and a power that the Commission is usurping; no distinction between the case where the question is whether a lawful power is unlawfully exercised, and a case where the question is, is there any law at all for the power claimed. Were the Commission exercising its power under the Interstate Commerce Act, attended with discrimination, the question would be whether the discrimination was "undue." But here the question is not one of discrimination, due or undue, under the Interstate Commerce Act; but has the Commission any power to do what it is seeking to do? No question of discrimination being "undue" arises, except in the wholly different sense of whether the advantages and disadvantages artificially accruing to the localities affected are substantial enough to call for the interposition of a court of equity.

In No. 29,247 a permanent injunction will be granted.

In No. 29,472 the temporary injunction prayed for will be granted.

It must be understood, however, that these orders of the Commission

are enjoined solely because, in our judgment, they lay upon the commerce and manufacturing of the localities affected an artificial hand that Congress never intended should be put forth, and therefore are outside the power conferred on the Commission by Congress; for with the question of a reduction in rates, or a re-adjustment of rates, from which such artificial results have been eliminated, we are not now dealing.

KOHLSAAT, Circuit Judge, concurs.

BAKER, Circuit Judge (dissenting). By the Hepburn act (Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]), the following provision, among others, was added to the interstate commerce law (Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]):

"It shall be its [the Commission's] duty, whenever, after full hearing upon a complaint, * * * it shall be of the opinion that any of the rates, or charges whatsoever, demanded, charged or collected by any common carrier or carriers * * * are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, * * * to determine and prescribe what will be the just and reasonable rate or rates to be thereafter observed in such cases as the maximum to be charged. * * * All orders * * * shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the Commission, unless the same shall be suspended or modified or set aside by the Commission or be suspended or set aside by a court of competent jurisdiction."

Complainants are common carriers whose rates on certain traffic are directed to be reduced by the order complained of. Two grounds for injunction are alleged. One is that the new rates are confiscatory. There is no proof whatever that the rates which the Commission prescribed as just and reasonable are not sufficient to pay the cost of handling that traffic, to cover that traffic's full proportion of maintenance and overhead expenses, and to return to the carriers an ample net profit. Furthermore, proof is lacking that, if the carriers should reduce other rates to correct what they claim is the maladjustment caused by the Commission's order, the reduction would not leave them abundant net returns. For the purposes of this hearing, therefore, it must stand as an agreed fact that the present reduction is neither directly nor indirectly obnoxious to the charge of taking private property without just compensation.

Discrimination is the other ground adduced by complainants. But the alleged discrimination is not against the carriers. It is against certain classes of traffic of Chicago and St. Louis and other places similarly situated. If it be true that loss or injury will be inflicted by the Commission's order upon Chicago and St. Louis shippers, they, if any, are the ones to complain. Nothing is added to the carriers' case by attempting to count upon the grievances of others.

There is only one aspect that I can discover in which the carriers' case remains for consideration. If the action of the Commission is outside of its lawful powers—if the grant of the rate-making power is itself void, or if, the grant being valid, the present action of the Com-

mission is not within the grant—the order complained of is the act of intermeddlers and trespassers. And on that basis the threatened invasion of the carriers' revenues would require an injunctive decree, whether the reduction would be confiscatory or not, or whether the interference would cause discrimination or not.

Certain shippers have been permitted to intervene and adopt the complainants' allegations regarding discrimination. I am doubtful of their right to stand in these suits as complainants. It is unnecessary, however, to consider that question, for on the evidence they have failed to establish preponderantly and clearly that the alleged discrimination is undue discrimination. Take the Detroit fiber-can maker, for example. He pays 19 cents a hundredweight on the raw material into Detroit and 56 cents a hundredweight on the finished product out to the Missouri river cities. His New York competitor pays 17 cents on the raw material into New York and 76 cents on the finished product out to the Missouri river cities. The Commission's reduction of 5 cents a hundredweight, instead of putting the Detroit maker under the heel of his Eastern competitor, would merely deprive him of a small part of the existing advantage in his favor. On the basis of last year's business, the Detroit man might suffer (if the Eastern maker should give Missouri river purchasers the whole benefit of the reduction) a diminution in his $27,000 net profits to the extent of $1,500 —about five-eighteenths of that part of the net profits attributable to the Detroit man's advantage in freight rates. In the other instances relied on, a weighing of the testimony leads to the same general conclusion, namely, that if the carriers, of their own initiative, had made the reductions in question, the shippers in Central Traffic territory could not establish by the evidence in this record that there was undue discrimination. If, however, these interveners are proper co-complainants, they are entitled to have their existing advantages protected from an invasion that has no warrant in law. But since that is the same question that arises on the bills of the complainant carriers, it is immaterial whether the interveners have any better standing than that of friendly advisers of the court.

Is the Commission's order void for want of jurisdiction to make it? The question is not whether a lawful power or authority has been shown to have been wrongly exercised, but whether there is any law at all for the power or authority claimed and exercised.

No contention is made that the portion of the Hepburn act herein above quoted is void on account of its being an unconstitutional delegation of legislative power. I assume, in the absence of specific assault, that the precedents have virtually placed that question beyond profitable debate. If Congress cannot constitutionally make a general declaration that the rates shall be reasonable and not unjustly discriminatory, and then trust an executive body to hear evidence and decide questions of fact respecting reasonableness and just discrimination, the power of Congress over rates would be worthless, for it would be utterly impracticable for Congress itself to make enactments to cover the specific instances.

No contention is directly made that the rate provision of the Hepburn act is void for indefiniteness and uncertainty. A direct answer, sufficient for present needs, I think, would be that the instructions to the Interstate Commerce Commission are as definite and certain as those given by state Legislatures to state commissions in commerce acts that have been upheld by all the courts. But that the rate provision of the Hepburn act is void for indefiniteness and uncertainty may indirectly be asserted in and by complainants' proposition that the particular way in which, or ground upon which, the Commission proceeded in these cases to reduce rates is not a way or ground included among those ways and grounds along and upon which Congress authorized the Commission to act.

I find in the rate provision no naming of specific grounds upon which the Commission must base its action. Such a naming would, of course, exclude all other grounds except those of the same nature. It is true that the initiative in rate changing remains with the carriers, and that the Commission can take jurisdiction only of those rates that are complained of, and can change such rates only after a full hearing. But neither can courts, of their own initiative, investigate and decide controversies. Limitation of procedure by which a subject-matter may be reached is no limitation of the power to deal with the subject-matter after it has been reached in accordance with the prescribed procedure. And I believe that the judicial department should not claim the exclusive right to make wrong decisions which shall be impervious to collateral attack.

Going further, and assuming that it is proper to inquire into the Commission's reasons for making these orders, I do not find that complainants' criticisms are justified.

Taking the opinion of the Commission in the Missouri river case in its entirety, it seems fairly clear to me (though certain parts removed from their context may create a doubt) that two issues were separately considered and passed upon. The first was the reasonableness of the $1.47 seaboard-Missouri river rate in and of itself. The fact that the $1.15 rate from the seaboard to St. Paul and the Chicago-Kansas City rate of 47 cents on traffic destined to Texas common points were profitable rates was considered as evidence that on the basis of cost of operation the seaboard-Missouri river rate was "unreasonably and unjustly high." The other issue was what, if any, reduction could be made "without doing injustice elsewhere." In substance, it was found that the St. Paul rate was influenced by lake competition, and the Texas rates by Gulf competition; that it would not be fair to the Twin Cities to deprive them of that part of the difference (all the difference except nine cents) which was fairly attributable exclusively to lake competition; and that the reduction to Western jobbers could be made, with probably great benefit to the prosperity of the country as a whole by reason of the extension and increased usefulness of centers of distribution, and without probably unduly affecting the commercial situation of Chicago and St. Louis. In short, it seems to me that the Commission took into consideration

all the pertinent facts and circumstances affecting the questions presented by the complaints before them.

If, however, it were conceded that the controlling consideration, without which the rate would not have been changed, was the Commission's intention to establish additional basing lines, the orders, in my judgment, would be within the power granted by Congress. One possible system of rate-making would be to adopt the postage method of a uniform charge throughout the whole country, irrespective of distance. Another would be to divide the country into zones, and adopt a uniform charge from any place within one zone to any place within another zone irrespective of distance. Another system would be to base the charge absolutely upon mileage. None of these has ever become established on American railroads (though I believe the use of any of them, because not expressly denied, was open to the Commission). But, if any serious meaning is to be attributed to the rate-making provision in the Hepburn act, there should be no doubt that Congress did not intend to deny to the Commission the right to use the very system which the railroads have developed and established in this country.

While cost of service must not be lost sight of in any system of rate-making, in the American system the prime factor has been the character of the merchandise and the volume of the traffic therein. That is, the prime factor has been the value of the service to commerce rather than the cost of the service to the carrier. In other words, the prime factor has been to charge what the traffic will bear; that is, not to charge what the traffic will not bear. For example, the discovery of natural gas in Indiana led to the establishment of steel, glass, and tinplate mills, which could be operated profitably on account of the cheap fuel. When the natural gas failed, those mills would have been compelled to quit on account of the high cost of transporting their manufacturing materials, if they had not obtained very cheap coal. The traffic managers of the railroads considered the situation and greatly reduced the rates on coal consigned to those mills, while maintaining the old rates on the very same kind of coal from the very same fields to other consumers in whose cases the carriers' cost of the transportation service was the same. The Indiana Railroad Commission held this not to be an unjust discrimination. This illustration gives a glimpse of the statesmanlike breadth of vision which traffic managers have quite generally employed in building up and maintaining the commerce of the country (and thereby the ultimate interests of their companies).

The principle of considering what the traffic will bear—what rates will best promote traffic as a whole—early led to the establishment of tapering rates. And while in former times competition (or pooling or other arrangement to avoid competition) was influential in determining rates to basing points (places common to two or more railroads), tapering rates invariably developed on the lines separately (in the absence of competition) by reason of the desire to encourage and promote traffic.

The first consolidations of minor lines into main lines from the East terminated at Buffalo, at Pittsburg, and at Parkersburg. Through those cities was drawn the line that separates Trunk Line territory from Central Traffic territory. The next extensions were to Chicago and St. Louis—to the line that separates Central Traffic territory from Trans-Mississippi territory. The rate from New York to Buffalo was less than the rate from New York to Syracuse, say, plus the rate from Syracuse to Buffalo. The New York–Buffalo haul was on one line, and the rate structure was built on the tapering plan. But when the new and separate line was extended to Cleveland, the rate from New York to Cleveland was likewise made less than the rate from New York to Buffalo plus the rate from Buffalo to Cleveland. And similarly the rate from New York to Chicago was made less than the rate from New York to Cleveland plus the rate from Cleveland to Chicago. The same thing was true of traffic from the Pacific coast; the San Francisco-Chicago rate being less than the sum of the in and out rates of Salt Lake City, Denver, or Kansas City. That is, in considering what rate in relation to distance a commodity could pay consistently with the largest volume and increase of volume of traffic, it was found (railroad economics being empirical) that the tapering plan should, as a general rule, be carried across the separate ownerships and across the dividing lines between "traffic territories."

When the federal government in quite recent years began to lay an effective restraining hand upon traffic management, the separately incorporated carriers had not extended the tapering plan across the dividing line between Central and Trans-Mississippi territory. Rebating was condemned (and may have been stopped). Discriminating in favor of industries or localities in which the carriers were privately interested was condemned (and may have been stopped). That was unjust discrimination. But the just discrimination which traffic managers founded on an untainted discernment of commercial conditions, growths, relations, and possibilities has never been condemned by Congress. Congress has not indicated any disapproval of the rate system that was actually developed between the Atlantic seaboard and the Mississippi. The presumption is, I think, that Congress desired the development of the tapering system of rates to continue, and expected that the carriers, when the population and purchasing power of the West should have sufficiently increased, would extend the same system beyond that they had brought to the Mississippi. The river is insignificant as a physical obstacle. The difficulty of arranging through transportation, if not already negligible on account of community of interests and various intercorporate relations would be no greater than it was in the cases of the lines east and west of Buffalo and of Pittsburg. The initiative has been left to the carriers; but not the ultimate determination. If the carriers have decided that a barrier shall stand till they say otherwise, nevertheless the growth in population and commerce will go on in the West and increasingly call for the removal of the barrier. If, by reason of the carriers' refusal, the Commission is required to act, I believe Congress in the Hepburn act expressed its intent that the Commission should be free to employ the

system of tapering rates (to be applied as a general, not an unalterable, rule) ; should be free to make the same kind of discriminations that the carriers could lawfully make if they had taken the initiative; should be free to consider the value of the service to the country's commerce rather than merely the cost of the service to the carriers; should be free, while securing to the carriers an ample immediate return, to adjust the rates so as to bring forth the largest volume and increase of volume of the country's commerce as a whole.

Complainants say that such vast power in the hands of the Commission might be used arbitrarily, to the ruin of particular regions or cities. That, of course, is not a conclusive argument that the power does not exist. To allow carefully selected public officers to exercise under the sanctity of their official oaths the same power over cities and regions that the carriers confessedly may exercise does not strike me as such a monstrous thing. And if dangers appear in the exercise of the grant, I think the remedies lie with the appointive power that determines the personnel of the Commission, and with the legislative power that can at its pleasure amend or repeal the interstate commerce law.